UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

MARIA NAVARRO CARRILLO AND JOSE
GARZON, on behalf of M.G. as parents and
natural guardians, and individually,

                    Plaintiffs,

        -against-

RICHARD CARRANZA, et al.,

                    Defendants.

--------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/10/21

20 Civ. 4639 (CM)

## DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

Plaintiffs appeal from the decision of a State Review Officer (SRO) affirming the findings of an Impartial Hearing Officer (IHO), who rejected plaintiffs' challenge to the Individualized Education Plan (IEP) prepared by their daughter's Committee on Special Education (CSE) and concluded that the IEP would have provided the child (M.G.) which a free appropriate public education (FAPE) for the 2018-29 school year.

For the reasons set forth below, the court affirms the SRO's rulings, denies the plaintiffs' motion for summary judgment and grants the defendants' cross motion for summary judgment. The complaint is dismissed, with prejudice.

## STATEMENT OF FACTS

The following statement of facts is taken almost verbatim from the SRO's description of the record. Unless specifically noted, none of these statements of fact is disputed.

1

## I.     Background Facts

M.G. is plaintiffs' minor daughter. She has been diagnosed as having cerebral palsy and has both global development delays and a visual cortical impairment (R0020). Born prematurely, the child has had three fingers amputated, and suffered a seizure and an intracranial bleed at age three months that resulted in left hemiparesis and right hemispheric volume loss (R0021-21). Due to her hydrocephalus, she had a ventriculoperitoneal shunt implanted (R0021). At age eight, she underwent bilateral hip osteotomies due to poor circulation (*Id.*)

M.G. began receiving services from the defendant district, including in home therapies, from an early age, starting with an Early Intervention Program. She later transferred to the public program. (*Id.*)

At the time of the impartial hearing challenging the child's IEP for the 2018-19 school year, which is the subject of this action, M.G. was ten years old. She was non-verbal and non-ambulatory and was dependent on adults for all activities of daily living. (*Id.*)

### A. *Prior Year's IEP*

M.G. attended the International Academy of Hope (iHOPE) from July 2015 through June 2018. She was placed there unilaterally by her parents.

After an impartial hearing relating to the child's IEP for the 2017-18 school year, an IHO found, as a matter of fact and law, that the educational program and iHOPE was appropriate and designed to serve the student's needs, while the district's proposed IEP (which called for her to be educated in a less restrictive public school setting) failed to provide M.G. with a FAPE. (R0022-23.) The decision was handed down on April 27, 2018, while the events that form the basis for the challenge that is the subject of this lawsuit were unfolding. The IHO directed the district to reconvene the CSE and draft a new IEP for M.G. for 2017-18 that incorporated all of the items in the iHOPE IEP dated February 13, 2017 – including iHOPE's disability classification of M.G.,

which was "traumatic brain injury" ("TBI"). The IHO also awarded the parents the full cost of tuition and related services provided by iHOPE for that school year. (*Id.*, *see also*, Pl. Brief in Support at p. 5)

The district did not take an appeal from that decision.

B. *Development of the 2018-19 IEP*

On February 14, 2018, the district notified the parents that it had scheduled a CSE meeting to develop the child's IEP for the next school year. (R1188, 1191.) The district's scheduled date was March 26, 2018. At the parents' request the meeting was rescheduled; it took place on March 19, 2018. (R1193, 1196.) The parents were present at the meeting, along with their advocate, a DOE representative, a school psychologist, a clinical social worker, and various special education teachers and related service providers, comprising the child's CSE. There is no evidence in the record that the parents requested the attendance of a school physician at this CSE meeting.

The CSE developed an IEP at this meeting that was not to the parents' liking. (R1199-1224.) It classified the student as having Multiple Disabilities and recommended that she be placed in a 12:1:3+1 placement (that is, a classroom with no more than 12 students, one teacher and one staff person for every three students, or a total of 5 adults for the 12 students) in a specialized school. The parties and the SRO refer to this as a 12:1:4 placement and the court will as well.

The IEP recommended that M.G. receive three 30-minute sessions per week of individual occupational therapy (OT), five 30-minute sessions per week of individual physical therapy ("PT"), four 30 minute sessions per week of individual speech-language therapy, two 30 minute sessions per week of group speech-language therapy, two 30 minute sessions per week of individual vision education services; and one 60 minute session per month of group parent counseling and training. (R1209). In addition, the CSE recommended a 1:1 full time paraprofessional for the student while at school, as well as a 1:1 full time paraprofessional while

3

she was being transported to and from school, daily group service to support her use of an assistive technology device, access to the school nurse as needed, and adaptive seating to accommodate her disability. (*Id., see also* R0145.)

The CSE recommended that M.G. participate in alternative assessment, receive specialized transportation, including a lift bus, that her travel time be limited, and that she have resources to address her management needs. (*Id.*)

The CSE recommended numerous annual goals and associated short term objectives for the student to achieve during the school year. (*Id.*)

The parents sent a letter to the CSE dated April 27, 2018. (R1086.) They asked that the CSE to reconvene in order to develop "an appropriate and timely IEP for the 2018-19 school year." (Parent Ex. N, cited at R0022). The parents asked that this meeting involve the full CSE committee, and specifically requested that a district physician be present in person. (*Id.*) They indicated that they could meet at any time on Mondays, and asked that the meeting take place at iHOPE.

The parents specifically requested that the CSE consider placement in a non-public school rather than in a specialized public school and asked that the CSE conduct the necessary evaluations for that purpose prior to reconvening the CSE. They stated that, once the parties had agreed on a mutually convenient date, they would provide the CSE with the child's most recent progress reports and other documentation for its consideration.

The parents demanded that the CSE meeting be recorded.

The IHO's decision in favor of the parents' challenge to M.G.'s 2017-18 IEP was released on the same day the parents sent this letter – April 27, 2018.

The district directed the CSE to reconvene on Friday, May 18, 2018. The parents, whose native language is not English, received a telephone call in their native language alerting them to

this meeting. They responded with yet another letter to the CSE chair, written by counsel and dated May 11, 2018. (R1088.) That letter referred back to the parents' April 27 letter and reiterated its demands. Counsel complained that the parents had not been given written notice of the proposed May 18 meeting, and indicated that the meeting ought not proceed, even though the parents had received telephonic notice of the meeting. Counsel noted that the parents had asked for several proposed dates and had indicated that they were available only on Mondays. And counsel asked that any new meeting notice confirm in writing the name of the parent member and school physician who would be participating, as well as provide assurances that those members of the CSE would be participating in person. Finally, counsel demanded that the district send a draft agenda for the new CSE meeting in writing at least seven days in advance of the meeting.

Substantively, counsel indicated that the previous CSE meeting was not an appropriate review because the IEP on which it relied – M.G.'s 2017-18 IEP – had been invalidated by the IHO's April 27 decision.

Despite all of these demands, the parents were making other plans for their daughter without any input from the district or the CSE. On May 16, 2018, they signed a school transportation services agreement for the 2018-19 school year with a private school. The school was not iHOPE, which the student had attended for the three preceding years and which the unappealed IHO decision established as her pendency; it was a newly opened school, a breakaway school from iHOPE, called iBRAIN.[1]

On May 21, 2018, the district sent the parents written notice of a CSE meeting scheduled for Monday, June 11, 2018. (R 1225,1228.) The notice included the names and titles of all CSE

---

[1] For information about the iHOPE/iBRAIN situation, including what the Second Circuit described as the "mass exodus of students from iHOPE to iBRAIN" (*Ventura de Paulino v. NYCDOE*, 959 F.3d 519 (2d Cir. 2020)), see the opinion of my colleague, The Hon. Jesse Furman, in *Ferreira v. NYCDOE*, 2020 WL 1158532, at *2 n.1 (S.D.N.Y. Mar. 6, 2020).

members who were scheduled to attend the meeting; it indicated that the school physician and parent members of the CSE were yet to be determined. In a notice dated May 22, 2018, the district advised counsel that it had rescheduled the meeting, for a Monday, and that a school physician would be present. The district declined to hold the meeting at iHOPE without receiving additional information and indicated that, in order to ensure appropriate and timely services for the 2018-19 school year, the meeting would not be rescheduled a third time. (R0024.)

On June 5, 2018, the parents signed an enrollment contract with iBRAIN for the 2018-19 school year. (*Id.*)

On Friday, June 8 – one business day before the date of the rescheduled CSE meeting and three days after the parents had committed to sending their daughter to iBRAIN – counsel for the parents indicated by letter (R1090) that the June 11 meeting could not go forward because the meeting notice did not identify the parent member or the school physician and did not include a social worker. Counsel also complained that the meeting notice did not guarantee that the school physician would attend in person. Counsel indicated that the parents would not agree to waive any of these. He also demanded further evaluations of the child for consideration of a non-public school placement.

The parents did not appear at the reconvened CSE meeting on June 11, 2018. Instead, by letter dated June 21, 2018, they provided the district with 10-day notice of their intent to place M.G. unilaterally at iBRAIN for the 2018-19 school year and to seek public funding for the placement. (R1092.)

*C. Due Process Complaint*

On July 9, 2018, the parents filed their due process complaint notice, alleging that the 2018-19 IEP failed to provide their daughter with a FAPE for that school year. They asked that pendency

be determined to consist of prospective payment of tuition at iBRAIN, with specialized transportation to be provided by iBRAIN, on the basis of the unappealed IHO decision.

The grounds assigned for concluding that the child's IEP would not provide her with a FAPE were as follows:

1. The March 19, 2018 CSE meeting was not held at a time that was mutually agreeable to the parents, did not comply with the parents' request for a "full committee" meeting and that the CSE members only "feigned interest" in the independent evaluative information offered by the parents, which denied them their right to participate meaningfully in the decisionmaking process

2. The March 19, 2018 IEP, with its 12:1+4 placement in a district specialized school, reduced the student-to-teacher ratio significantly and with no substantiation for the change, would not provide the 1:1 direct instruction M.G. required, and did not place the child in her least restrictive environment.

3. The March 19, 2018 IEP reduced the recommended level of service mandates, did not adequately describe the student's then present levels of performance or management needs, lacked an extended school day, and contained immeasurable goals.

4. The district ignored the parents' April 27, 2018 written request to reconvene the March 19, 2018 CSE meeting.

The due process complaint sought direct funding of M.G.'s program at iBRAIN for the 2018-19 extended school year, together with transportation and other costs, as well as an order directing the CSE to reconvene an annual review meeting for the student.

An impartial hearing convened on August 17, 2018. The pendency portion of the hearing took five hearing days and concluded on January 14, 2019. (R 0172-0377.[2]) By interim decision dated March 5, 2019, IHO Carter found that M.G.'s pendency was iHOPE, on the basis of the unappealed IHO decision dated April 27, 2018. As a result, the IHO denied interim funding at iBRAIN for the cost of M.G.'s education. (R0025.) The parents appealed that decision to this court, which concluded that they were entitled to funding on the theory that iBRAIN offered M.G. an

---

[2] The pendency hearing took place before two different hearing officers: IHO Hill was replaced in the middle of the hearing by IHO Carter, the IHO who presided at M.G.'s impartial hearing for the 2017-18 school year.

educational experience that was "substantially similar" to iHOPE. On May 18, 2020, the United

States Court of Appeals for the Second Circuit reversed that decision, identified iHOPE as M.G.'s

pendency, and declared that the district had no obligation to subsidize the parents *pendente lite* for

their unilateral placement of the child at iBRAIN on a "substantial similarity" theory. *Maria*

*Navarro Carrillo* v. *NYCDOE*, No. 19-1813-cv, *reported sub nom Ventura de Paulino v.*

*NYCDOE,* 959 F.3d 519 (2d Cir. 2020).

 The impartial hearing on the merits of the parents' FAPE claim convened on March 11,

2019.  After taking evidence over four hearing days, the record closed on June 13, 2019. (R0025.)

 The IHO issued a final decision on September 21, 2019. It bears noting that the hearing

was decided by the same IHO, Suzanne Carter, who had ruled in favor of the parents after the

hearing on the student's 2017-18 IEP. This time, she ruled in favor of the defendant district.

(R0068-0095).

 IHO Carter found that the March 2018-19 IEP offered M.G. a FAPE. She concluded that:

1. None of the alleged procedural irregularities – the parents' claim that the March 2018 CSE meeting was untimely, that the CSE was not properly composed, that the parent's request that the CSE reconvene was "ignored," and that the district failed to reconvene a CSE for the year 2017-18 after Carter's previous decision directing that it do so – denied the child a FAPE.

2. The student was better classified as having multiple disabilities, rather than TBI, and while the parents and district disagreed about the appropriate classification, this did not deny M.G. a FAPE.

3. The district's proposed 12:1+4 placement provided the student with a FAPE. Although the parents and district agreed that the student had "highly intensive management needs requiring a high degree of individualized attention and intervention" (R0081) – which would ordinarily place the student, per NYSED Commissioner's Regulations, in a 6:1+1 classroom, see 8 N.Y.C.R.R. §200.6(h)(4)(ii)(a) – the IHO concluded that the district special class placement together with a full time individual health paraprofessional to address the student's needs, would give M.G. "multiple trained paraprofessionals to work collaboratively with the teacher, and related service providers for repetition and generalization." (id.)

4. The fact that the student was being give services (OT/PT/speech and language therapy, and vision education) in 30 rather than 60-minute increments under the IEP did not deny the child a FAPE. The parents preferred 60 minutes to build in time for her to deal with fatigue; the district preferred the shorter sessions precisely because the student became fatigued. The IHO concluded, after reviewing reports from iHOPE, that "60 minutes of OT was overwhelming for the Student," and noted that the parents provided no independent medical testimony or documentation to support their contention that more time would be better.

5. Any typographical or other technical errors in the student's IEP could have been remedied had the parents attended any of the scheduled CSE meeting after March 2018; they chose not to do so.

6. The goals and objectives, some of which built upon those achieved or partially achieved in M.G.'s January 2018 progress reports, were appropriate to her needs.

7. M.G. did not require individualized nursing services; she had no individual nurse at iHOPE and the CSE recommended that she have a fulltime 1:1 health paraprofessional who could alert the school nurse when needed.

8. The CSE did not "predetermine" the results of the meeting or the contents of the student's IEP.

IHO Carter concluded her discussion of the child's IEP with the following: "The DOE provided the Student with a FAPE for the 18/19 school year despite the obstructive efforts of Parents and Parents' counsel..." (R0085.)

Having concluded that the IEP did not deny M.G. a FAPE for 2018-19, the IHO did not need to address the parents' contentions that iBRAIN was an appropriate placement for their daughter, or that equitable considerations favored reimbursing them for iBRAIN tuition. However, IHO Carter did address those issues (presumably to avoid remand in the event she was reversed on the FAPE issue).

IHO Carter concluded that iBRAIN was not an appropriate placement for M.G. in July 2018 for, among other reasons:

1. It was not accredited or vetted by any state or regional credentialing agency.

2. All students at iBRAIN attend an extended school day and receive the same academic program and related services in 60-minute sessions; there "does not appear to be any

individualization based on nature of disability, severity of disability, abilities or limitations."

3. Vision education services and parent counseling and training were not available when iBRAIN opened in July 2018 due to lack of providers. Missed sessions were allegedly to be made up, but no documentation of same was provided, and one iBRAIN witness, Ms. Semm, could not attest, in testimony given in June 2019 (i.e., at the end of the school year), that all missed sessions had in fact been made up.

4. iBRAIN lacked sufficient assistive technology services.

Finally, IHO Carter concluded that equitable considerations did not favor reimbursing the parents for the cost of M.G.'s attendance at iBRAIN, for the following reasons:

1. The parents testified that they removed their daughter from iHOPE because of administrative changes and a contract asking for a deposit in an amount they could not afford, but presented no documentary evidence that compared the cost of iHOPE and iBRAIN.[3]

2. iBRAIN tuition is not reasonable. The student was receiving only 8.5 hours of academics per week, which was far less than she would have received in a public school placement. The remainder of her time was spent in related services that exceeded the amount recommended in the challenged IEP and that were in some cases not even delivered.

3. iBRAIN's charges for related services provided by its salaried employees amounted to double dipping and exceeded what was provided for in the March 2018 IEP.

4. iBRAIN appeared to have been created solely for purposes of litigation (see n.3, *supra*).

5. The iBRAIN IEP was simply a cut and paste of the 2017-18 iHOPE IEP.

6. The daily rate for M.G.'s privately provided transportation was not reasonable and there was no proof that the transportation service offered by iBRAIN complied with city and state regulations regarding the transportation of school children.

7. The parents' testimony at the latter hearing was not credible in multiple respects: the parents' 10 day notice falsely alleged that the DOE had not conducted an annual IEP for the student (the CSE meeting on March 18, 2018 was that annual evaluation); the parent asserted in testimony that he never received a copy of the March 2018 IEP,

---

[3] Although this is not part of the administrative record, the Second Circuit, citing my colleague Judge Furman, noted when deciding the parents' appeal from the IHO's denial of tuition reimbursement *pendente lite* that iBRAIN was founded by the founder of the law firm that represents Ms. Navarro and Mr. Garzon – a highly suspicious fact in and of itself – and also noted that the City had represented, without contradiction, that the cost of attending iBRAIN was significantly higher than the cost of attending iHOPE. *Ventura de Paulino, supra.* – F. 3d at PAGE, and n.69. This court can and does take judicial notice of every Second Circuit opinion, but especially of opinions reversing my prior orders and judgments, as *Ventura de Paulino* did.

which contention was not raised in the 10 day notice or the complaint; and the father lied when he testified that he had visited the placement school twice in an effort to cooperate with the district. This finding takes on particular significance since IHO Carter also presided at M.G.'s 2017-18 impartial hearing – and ruled in her parents' favor – so she had two opportunities to listen to the parents and could not be accused of being unsympathetic to their concerns.

8. Finally, IHO Carter concluded that the parents and their counsel had not cooperate with the educational planning for M.G.: "Parents failed to attend two meeting after expressing disagreement with the IEP. They presented specious claims about the prior written notices. Parents also alleged CSE did not contact to [sic] them to review the April 27, 2018 decision but DOE records show the opposite. Counsel's letters to the CSE make unreasonable demands in violation of the requirement to scheduling the meeting at a mutually agreed on time and place. See CFR §300.322. He failed to detail any of Parents' concerns about the March 2018 IEP in letters to the CSE. Parent did not remember when he visited the school placement if he did at all. These actions would warrant a reduction in tuition funding because they obstructed Student's educational planning."

D. *The SRO's Affirmance*

The parents took an appeal from IHO Carter's decision.[4] The SRO affirmed the decision in all respects in a lengthy (34 single spaced pages) and well-reasoned decision dated December 4, 2019.

The SRO refused to act on the parents' appeal from IHO Carter's March 5, 2019 interim decision finding that M.G.'s pendency was iHOPE, on the ground that the parents had taken the matter to the courts and the question was at the time *sub judice* in the Second Circuit. (R0032). As noted previously, the Second Circuit subsequently agreed with IHO Carter that iHOPE was the child's pendency and reversed this court's order directing the district to pay tuition to iBRAIN pendente lite on a "substantially similar" pendency theory. *Ventura de Paulino*, 959 F.3d 519. That is the law of the case for M.G. for the educational year 2018-19 and the issue will not be further addressed.

_____

[4] Interestingly, the parents' appeal was actually a cross appeal. The district filed a notice of appeal first, from so much of the IHO's order as required it to reimburse the parents for transportation services and related services that had been provided to the student by iBRAIN during the 2018-19 school year – an award made because, in the words of the IHO, M.G. was entitled to these services no matter where she went to school.

The SRO rejected the parents' argument that IHO Carter's decision with respect to the 2017-18 school year created a "status quo" mandating a finding that the 2018-19 IEP was deficient and that the parent's unilateral placement of the child at iBRAIN was appropriate. He noted that the appropriateness of an IEP for each school year is to be decided on its own merits, and that each school year was to be treated separately. (R0032 and cases cited.)

The SRO affirmed IHO Carter's determination that the March 2018 CSE meeting did not constitute a procedural violation that impeded M.G.'s right to a FAPE, deprived her of educational benefits, or significantly impeded the parents' opportunity to participate in the decisionmaking process concerning the education of their disabled child. (R0033 *et seq*) Specifically, SRO Bates concluded as follows:

1. The March 2018 was not untimely, as the IDEA and State regulations require only that a district must have an IEP in place for every child at the beginning of the school year—which was July 1, 2018, a full three and one half months after the 2018-19 IEP was crafted.

2. The IHO did not err in concluding that the CSE "predetermined" the results of the March 2018 meeting. The SRO noted that parental disagreement with the results of a CSE meeting did not amount to the denial of meaningful participation as long as the parents are listened to; the IDEA does not give the parents "veto power" over aspects of the IEP with which they do not agree. Nor does the record of the impartial hearing suggest that the CSE lacked an open mind, or adhered to a one size fits all philosophy. The hearing record also showed that the parents and their advocate were present and provided evidence, as did staff from iHOPE, who participated by telephone. (R0035.) "The IHO correctly noted that predetermination does not lie as long as district personnel ae willing to listen to the parents and the parents have the opportunity to make objections and suggestions." (R0036.)

3. The IHO did not err in concluding that the CSE failed to reconvene the March 2018 CSE meeting. In fact, the district did reconvene the meeting, on June 11, 2018 – after rescheduling it at the parents' request from May 18, 2018 – but as the parents refused to attend, the district concluded that there was no need to proceed with the meeting. SRO Bates found that the parents had received telephonic notice of the meeting; that it had been rescheduled for a Monday at the parents' request;[5] that the parents were given written bilingual notice of the June 11 meeting by notice dated May 21, 2018; that the

---

[5] SRO Bates erroneously stated that the district first scheduled the meeting for "Monday, May 18, 2018" – in fact May 18 fell on a Friday during 2018.

parents announced that the meeting could not go forward as scheduled on the last
business day before it was set to occur – Friday, June 8 – on the ground that the meeting
notice did not "include" (identify) who the parent member, the physician and the social
worked members of the CSE would be; that the parents were contacted by telephone
on June 9 (Saturday) by a bilingual staff member and urged to attend the meeting; that
the parents and their lawyer simply did not show up on June 11, although the mother
had told the staff member who called her two days earlier that the date was "fine with
me." The SRO noted that the parents were technically correct that CSE meeting notices
should include the names of all proposed CSE members, and that parents are indeed
entitled to request the attendance of a school physician at such a meeting as late as 72
hours prior to the CSE meeting. But the SRO further noted that state regulations permit
the CSE to make alternative arrangements for remote CSE participation, such that the
physical presence of any member of the CSE in the room was not something on which
the parents could insist, and the failure to list everyone's name in the meeting notice
was not shown to have denied M.G. a FAPE. The SRO concluded "It appears that the
district engaged in a good-faith effort to reconvene the CSE in compliance with the
parents' requests;" and "In this case, there was no further purpose for conducting a June
11, 2018 CSE meeting" when the parents failed to show up, because the sole purpose
of the meeting was "to satisfy the parents' request to conduct a second meeting." The
SRO also noted that the district had gone out of its way to comply with "most of the
parents' demands," and did not cite any authority that required compliance with all of
them – some of which were manifestly unreasonable (holding the meeting at iHOPE,
for example).

4.  The SRO agreed with the IHO that the 2018-19 IEP was not deficient for concluding
    that M.G. should receive educational services as a "multiple disabilities" student rather
    than a "traumatic brain injury" student. The SRO's comprehensive reasoning went
    substantially beyond that of IHO Carter. SRO Bates noted that "CSEs are not supposed
    to rely on a student's disability category in order to determine the needs, goals,
    accommodations and special education services in a student's IEP." (R0040.) After
    discussing the meaning of both "traumatic brain injury" and "multiple disabilities,"
    SRO Bates concluded that a "multiple disabilities" classification was appropriate for
    M.G. given her "complex educational needs" and "concomitant impairments, 'the
    combination of which cause such severe educational needs that they cannot be
    accommodated in a special education program solely for one of the impairments."
    (R0041.)

5.  The SRO affirmed the IHO's finding that a 12:4+1 special class placement was
    appropriate. He noted that state regulations indicate that the maximum class size for
    special classes containing students whose management needs are "highly intensive and
    requiring a high degree of individualized attention and intervention" "shall not exceed
    six students, with one or more supplementary school personnel assigned to each class
    during periods of instruction." 8 NYCRR 200.6(h)(4)(ii)(a). State regulations further
    provide that the maximum class size for those students with severe multiple disabilities,
    whose programs consist primarily of habilitation and treatment, shall not exceed 12
    students, including one teacher and additional staff in a staff/student ratio of 1 staff
    person – whether teachers, supplementary school personnel, or related service

providers – for every 3 students. M.G. falls into both categories. The SRO noted that the CSE had considered a February 17, 2017 psychoeducational evaluation report; a January 25, 2018 classroom observation report, a February 6, 2018 social history update, and a March 13, 2018 recommended IEP from iHOPE while formulating her IEP. In light of the various findings in those reports and assessments – which the SRO discussed in copious detail -- the SRO concluded that the CSE was not wrong to conclude that the student would do better in a 12:1+4 classroom because it would provide both more and more different types of adult supervision (supplemented by a 1:1 aide who would pay attention to no one but M.G.) to address her multiple needs. The SRO concluded that the parents' focus on the words "highly intensive" – which were employed by district witnesses to describe their daughter's needs – "does not resolve the question of whether the recommended 12:1+4 special class was appropriate for the student in light of the full constellation of her educational needs and multiple diagnoses." (R0047.) The SRO noted that the student's admittedly "highly intensive" management needs stemmed from "the fact that the student has severe multiple disabilities, has need for programming in the areas habilitation and treatment, needs a staff/student ratio of at least one staff person to three students, and requires services for additional staff that are teachers, supplementary school personnel and related service providers." (R0049). The SRO thus concluded that the 12:1+4 class "is precisely the type of programming that will address this student's unique needs . . . notwithstanding the fact that at time the professional working with, observing and evaluating the student ay happen to describe those needs with a moniker of 'highly intensive.'" (*Id.*) Finally, the SRO noted that the student would in addition be supplied with "a full time 1:1 paraprofessional" in the classroom and an additional 1:1 paraprofessional while being transported to and from school, as well as numerous related services.

6.  **Related Services**.  The SRO concluded that the IHO was correct is rejecting the parents' contention that M.G. was denied a FAPE because the IEP called for her OT, PT and speech therapy sessions to last for 30 rather than 60 minutes. Observations of the child indicated that she became tired during long sessions and a psychologist who had worked extensively with students like M.G. testified indicated that 30 minutes was sufficient given the child's level of functioning and sustainability, and the benefit she would derive.

    The SRO noted testimony from the iBRAIN special education director to the effect that 60 minute sessions were required because it took "a lot of time' to transition the child safely from her wheelchair and because the child would benefit from "additional repetitions and practices," but observed that the iBRAIN IEP for M.G. for 2018-19 described the child as demonstrating behavioral issues and frustration if she was touched for too long at PT. SRO Bates also noted that the district psychologist questioned the need to remove the child from her chair during therapy, given that this had not occurred during her enrollment at iHOPE; the psychologist also testified that 60 minutes of therapy meant 60 minutes of actual therapy ("therapy begins the moment therapy actually begins, not while the child is transitioning"). In light of the evidence, the SRO affirmed the IHO's findings. (R0050.)

7. **Special Transportation**. Finally, the SRO rejected the parents' challenge to the CSE's recommendations for transportation for M.G., which included a full time 1:1 paraprofessional for transportation purposes (in addition to her 1:1 health paraprofessional during school), a lift bus, limited travel time and commodious seating. Indeed, the SRO concluded that the parents had not alleged any defect specific to their daughter's transportation services that rose to the level of denial of a FAPE, or explained what it was about those services that resulted in denial of a FAPE. SRO Bates declined to rule on what he referred to as the parents' "systemic" issue with the CSE's use of what they described as "non-CSE entities" to develop and recommend appropriate transportation arrangements for disabled children, stating that any such challenge fell outside the scope of an impartial hearing, which was limited to ruling on issues relating to one specific child. (R0051.)

8. Appropriateness of Unilateral Placement and Equitable Considerations. In light of his conclusion that the district's IEP provided the child with a FAPE, the SRO declined to address whether the parents' unilateral placement of their child at iBRAIN was appropriate or, if it was, whether equitable considerations supported an award of tuition.

This appeal followed.

## DISCUSSION

The SRO's decision is subject to independent judicial review. However, this "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities..." Board of Education v. Rowley, 458 U.S. 176, 206 (1982). Federal courts may not simply rubber stamp administrative decisions, but they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult questions of educational policy. Walczak v. Florida Union Free School Dist., 142 F. 3d 119, 129 (2d Cir. 2001).

As the Second Circuit noted in Walczak, deference is particularly appropriate where, as here, the state hearing officers' review has been thorough and careful. In this regard, I must note that the decision of the State Review Officer explores the evidence thoroughly, make detailed factual findings that are supported by the evidence, and cogently explain the reasons for the

conclusions they reach. The SRO's decision is well well-reasoned and well-supported by citations to relevant portions of the record. It is owed the degree of deference I am expected to give it.

Where, as here, we are dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A Board of Education may be required to pay for educational services obtained for a student by his or her parent, if (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim. Burlington School Committee v. Dept. of Education, 471 U.S. 359 (1985). Traditionally, the district bore the burden of proof on the first issue; the parents have the burden of proof on the others. M.S. v. Board of Education of the City School District of Yonkers, 231 F. 3d 96, 102, 104 (2d Cir. 2000). However, the United States Supreme Court has ruled that the party who requests an impartial hearing -- in this case, the parents -- bears the burden of proving all three prong of the *Burlington* test, including that the services offered by the Board were inadequate. Schaffer v. Weast, 126 S.Ct. 528 (2005).

The parents can satisfy their burden of proving that the district's plan did not afford their child a FAPE by establishing either (1) that the state did not comply with the procedural requirements of IDEA; or (2) that the challenged IEP was not "reasonably calculated to enable the child to receive educational benefits." Rowley, *supra*, 458 U.S. at 206-07.

Finally, in IDEA, Congress expressed a strong preference for keeping the child in the "least restrictive placement" in which she could receive educational benefits. 20 U.S.C. § 1412(a)(5).

I.    **The SRO Did Not err in concluding that MG's pendency placement was not iBRAIN**

The first error assigned by the parents is that the SRO should have reversed the IHO's finding that MG's pendency placement was iBRAIN. As I have already noted, thanks to the Second

16

Circuit's ruling in connection with the district's appeal from my ruling ordering the payment of tuition at iBRAIN pendente lite, that issue has been definitively resolved above my pay grade.

Under IDEA, the pendency inquiry focuses on identifying the student's "then current" educational placement. Zvi D., 694 F. 2d at 906. Although not defined by statute, the phrase "then current placement" has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced. Murphy v. Board of Education, 86 F. Supp. 2d 354, 359 (S.D.N.Y. 2000), aff'd 297 F. 3d 195 (2002). The United States Department of Education has opined that a child's then current educational placement would "generally be taken to mean current special education and related services provided in accordance with a child's most recent [IEP]." Susquenita School District v. Ralee S., 96 F. 3d 78 (3d Cir. 1996). Therefore, the pendency placement is generally the last unchallenged IEP. However, if there is an agreement between the parties on placement during the proceedings, it need not be reduced to a new IEP, and it can supercede the prior unchallenged IEP as the then current placement. Bd. of Education v. Schutz, 137 F. Supp. 2d 83 (N.D.N.Y.2001), aff'd, 290 F. 3d 476, 484 (2d Cir. 2002), cert denied, 123 S. Ct. 1284 (2003).

Once a pendency placement has been established, it can only be changed by an agreement of the parties, and impartial hearing officer's decision that is not appealed, or a decision of a state review officer that agrees with the child's parents. 34 C.F.R. §300.514(c); 8 NYCRR 200.5(I)(2)) or determination by a court. Bd. of Educ. v. Schutz, 290 F. 3d 476, 484 (2d Cir. 2002), cert denied, 123 S. Ct. 1284 (2003); Bd of Educ. v. Engwiller, 170 F. Supp. 2d 410, 415 (S.D.N.Y.2001). "Implicit in the concept of 'educational placement' in [IDEA's] stay put provision (i.e., a pendency placement) is the idea that the parents and the school district must agree either expressly or as

impliedly by law to a child's educational program." *Ventura de Paulino*, 959 F. 3d at 532, (2d Cir. 2020).

In *Ventura de Paulino*, the United States Court of Appeals for the Second Circuit concluded that M.G.'s pendency placement was iHOPE, by virtue of the fact that an IHO had concluded, in resolving the parents' challenge to the child's 2017-18 IEP, that iHOPE was an appropriate placement for MG – a ruling that the City failed to appeal. *Id.* & n. 54. At no point has the City, expressly or implicitly, agreed to change the child's placement to iBRAIN; nor has the child's CSE developed an IEP that would place her at iBRAIN. Accordingly, the last agreed-upon placement is iHOPE.

## II. The procedural issues raised by the parents did not deny the child a FAPE or deny them a meaningful opportunity to participate in the development of their child's educational program

Procedural flaws do not automatically require a finding of a denial of a FAPE. Only procedural inadequacies that individually or cumulatively result in the loss or educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE. Knable v. Bexley City School District, 238 F. 3d 755, 766 (6th Cir. 2001), *cert. denied*, 533 U.S. 950 (2001). Since July 1, 2005, the IDEA provides that a hearing officer may find a child did not receive a FAPE only if procedural inadequacies: (i) compromised the child's right to a FAPE; (ii) seriously hampered the parent's right to participate in the process; or (iii) constituted a departure of educational benefits.

In this case, the parents raise a number of procedural challenges to their daughter's IEP. Both the IHO and the SRO concluded that none of them – individually or collectively – denied the girl a FAPE. I see no error in his conclusions.

*A. The First CSE Meeting*

The district did not deny M.G. a FAPE by holding her CSE meeting in March 2018, rather than on an earlier date (January 9, 2018) that appears on the form of CSE meeting notice that is automatically input by the district's Special Education Student Information System (a computer record system). The law requires only that the child have an IEP in place by the start of the new school year (in her case, July 1, 2018). The parents admit that they received a notice of meeting dated February 27, 2018, which indicated that a meeting would be held on March 19, 2018. (Docket #40 at 11) As the SRO correctly concluded, a March 19, 2018 CSE meeting guaranteed that the child would have an IEP in place at the start of the new school year. Nothing more is required by the law.

The CSE also did not deny M.G. a FAPE by predetermining what her recommended placement would be. It is well settled that consideration of possible recommendations for a student prior to a CSE meeting is not prohibited, as long as the CSE understands that changes may occur at the meeting. In fact, districts may arrive at the CSE meeting with pre-formed ideas about the best course of action for the child. *M.M. v. NYC DOE Region 9 (Dist. 2),* 583 F. Supp. 2d 498,506 (S.D.N.Y. 2008). The key factor, as the SRO noted, is whether the CSE "has an open mind as to the contents of [the student's] IEP" (R0034, citing *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F. 3d 547, 253 (2d Cir. 2009), and cases cited), and is willing to listen to the parents and to give them an opportunity to object. And while IDEA sets forth procedural safeguards that allow parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child," 20 U.S.C. § 1415(b)(1), the fact that the CSE decides on a course that differs from the parents' wishes does not amount to denial of meaningful participation by the parents. IDEA "gives the parents the right to participate in the development of

their child's IEP, not a veto power over those aspects of the IEP with which they do not agree." (R0035.)

The SRO concluded that the record failed to show that the CSE lacked an open mind with respect to details of the student's program. The meeting lasted for 2.5 to 3 hours, and the parents (notably the student's father) testified at the impartial hearing that he had both attended the meeting and interacted with the CSE during the meeting. (R0035, citing Tr. 626-27.) Of course, the parents disagreed with the results, but that does not mean they were not given the opportunity to participate and raise objections to the district's proposals. Neither does it mean that CSE representatives did not listen to the parents or take their point of view into account. The record also shows that the parents had an advocate at the meeting, and that M.G.'s iHOPE teacher and other providers from iHOPE were in attendance by telephone, which gave them an opportunity to advocate for their preferred placement.

Frankly, on the issue of predetermination, the record actually suggests that it was the parents, not the district, who lacked an open mind about the process. It is abundantly clear, from the totality of the evidence, that the parents intended to keep their child in private school – and indeed, to move her from iHOPE to the about-to-be-opened iBRAIN – regardless of what the CSE finally did.

Other issues raised in the briefing to this court include the failure of the school to have a school physician present at the March 19 IEP meeting. The SRO did not specifically address this in his opinion. There is, however, no evidence in the record that the parents or anyone from the district asked for the presence of a physician at that meeting.  It was the parents' right to do so, but they did not; and no one has pointed the court to any requirement that a physician be present absent such a request. Significantly, the parents did not bring the child's physician to the meeting or

submit any new medical records for the girl in advance of the meeting -- which suggests, as both the IHO and SRO found, that the girl's medical conditions were not in dispute.

## B.   The Second CSE Meeting

As noted in the statement of facts, on April 27, 2018 – the same day that IHO Carter handed down her decision relating to the 2017-18 year, which established iHOPE as the student's pendency – the parents asked the district to reconvene the CSE. As far as this court is concerned, the record establishes beyond peradventure that the parents had decided by this time that they had no intention of enrolling their child in accordance with any IEP developed by the CSE that did not recommend private school. It is also indisputable that they initiated the request for a second CSE meeting in bad faith and with no intention of cooperating with that process. Nothing about what occurred between April 27, 2018 and June 11, 2018 establishes – or even remotely suggests – that *the district* significantly impeded the opportunity of M.G.'s parents to participate in the decisionmaking process regarding the provision of a FAPE to their daughter, while everything suggests that *the parents* significantly impeded the CSE from doing its job. As it is clear that the parents intended all along to go their own way, it hardly lies in their mouths to suggest otherwise.

The parents were, however, within their rights to ask the district to reconvene the CSE and review their child's 2018-19 IEP, especially in light of the IHO's decision concerning the 2017-18 school year. 34 C.F.R. 300.503; 8 NYCRR 200.5(a). The parents' letter and their lawyer's subsequent letter addressing a reconvening of the CSE contained a number of "demands" on their part, including that (1) a school physician participate "in person" (by which they apparently meant, not by telephone or videoconference, as permitted by 8 NYCRR 300.5(d)(7)); (2) a group of iHOPE teachers and related service providers receive notice of the meeting; (3) the meeting take place only on a Monday; (4) the meeting take place at iHOPE; and (5) the CSE consider a private school placement and conduct "necessary" evaluations for same prior to scheduling the CSE

meeting. The parents indicated that they would provide M.G.'s "most recent student progress report," but only after the meeting was scheduled. The parents also asked for "a few proposed dates and times in writing" and asked that the meeting not be scheduled by telephone. They also asked that the meeting be recorded.

The district did not turn the parents' request down, but neither did it agree to all of the parents' "conditions," which this court finds were nothing more than pretext to set up an argument that the child was denied a FAPE by virtue of alleged procedural defalcations. In this regard, I find the parents' lawyer's one paragraph description of the events of March -June 2018, which appears at pages 5-6 of his Memorandum of Law (Docket #40), to be incomplete to the point of being utterly misleading – which, in the opinion of this court, casts doubt on his entire presentation.

The district did schedule another CSE meeting for the child, setting a meeting date of May 18, 2018 (a Friday)[6] and notifying the parents by telephone. On May 11, counsel for the parents wrote the district asking that it reconvene the CSE for both the current (2017-18) and year and the upcoming (2018-19) year; complained about the fact that no written notice had been sent and asked that the meeting be rescheduled at a time, and in light of, the various demands in the April 27, 2018 letter.

The district then sent a written notice, dated May 21, 2018, granting the request for rescheduling and rescheduling the meeting for Monday, June 11. The district also indicated that a school physician would be present. The district refused to hold the meeting at iHOPE – a decision that had nothing to do with whether any IEP offered M.G. a FAPE.

The district's letter went on to say that, because an IEP had to be in place before the commencement of the new extended school year (i.e., on July 1, 2018), the meeting had to take

---

[6] The parents point to no legal requirement that the district offer them multiple possible meeting dates; as far as I can tell, there is no such requirement.

place on June 11 and would not be rescheduled. Of course, by then the parents had already decided to send their child to iBRAIN, as indicated by the fact that they had signed a transportation agreement with that school on May 16 and would sign a contract of enrollment on June 5.

The parents did not indicate that there was any problem with the June 11 meeting date until June 8 – literally the last business day prior to the scheduled meeting, and a Friday to boot – when the parents' attorney sent yet another letter declaring that the meeting could not proceed the following Monday, because the meeting notice did not identify the additional parent member, the school physician or the social worked who would be participating, or indicate that the physician would be participating in person. (R0038, citing Parent Ex. P.) The letter asked for yet another alternative date. The letter did not indicate that the parents were in contract with iBRAIN.

On Saturday, June 9, a bilingual social worker for the district contacted the parents by telephone to urge them to attend the meeting, but they did not show up. Because the meeting had been requested by the parents, who were not there to make any presentation, the CSE adjourned without holding a meeting.

As the SRO noted, the parents were correct in stating that CSE meeting notices shall include the names of the proposed CSE members, 34 C.F.R. § 300.322(b)(1)(i). There was, therefore, a technical deficiency in the notices.

But as the SRO held, the parents did not explain how not knowing in advance the names of the parent rep, the physician[7] and the social worker had denied their daughter a FAPE or them meaningful participation in the IEP formulation process -- especially as extrinsic evidence demonstrates that the parents were contriving excuses not to participate in the process they had

---

[7] Indeed, it does not appears that failing to include the name of the participating physician in the notice of meeting could ever constitute the denial of a FAPE, since parents may request the attendance of a school physician in writing as late as 72 hours prior to the actual date of the CSE meeting (8 NYCRR 200.3(a)(1)(vii) – far too late for the school to give advance notice of who the attending physician is going to be.

23

initiated. Plaintiffs simply refuse to engage with the legal standard applicable to procedural flaws in an IEP formulation process; errors without any identified consequences are "no harm, no foul" errors, and the failure to provide all the names falls into that category.

Finally, contrary to the parents' contention below, the district neither "denied" nor "ignored" their request to reconvene the CSE, but (as the SRO found) "engaged in a good faith effort to reconvene the CSE in response to the parents' request." The district was ready, willing and able to proceed with a new CSE meeting on June 11, at which point they could have made their argument that IHO Carter's unappealed April 27, 2018 decision on their appeal with respect to M.G.'s 2017-18 IEP (which was not yet available when the IEP was formulated in March) should provide "the roadmap" for moving forward with the girl's educational planning.[8] The parents chose not to attend the meeting. That being so, the SRO correctly found that there was no purpose in going ahead with the June 11 CSE meeting once the parents refused to attend - since the only reason for scheduling that meeting in the first place was to satisfy the parents' demand for reconsideration of their daughter's 2018-19 IEP.

The critically important thing about all of the parents' procedural complaints – some of which constitute technical violations of the IDEA regulations, some of which were made up out of whole cloth – is that the parents have not identified how any of them adversely impacted either their daughter's right to a FAPE or their right to participate in the process of formulating her IEP. If the parents were serious about the latter, they would have come to the meeting scheduled on June 11, 2018 (a Monday, as they requested) and made their case for a private school placement to the CSE. It was not the fault of the district that they did not do so.

---

[8]  It is not insignificant that IHO Carter herself – the author of "the roadmap" – did not consider her decision relating to 2017-18 to bind her in any way with regard to 2018-19, but instead rendered an entirely different decision for that year's IEP, after listening to days of evidence at a new and different impartial hearing -- one at which the district appears to have cured some of the defects in its presentation of the previous year.

Although this is an appeal from the decision of the SRO, not the IHO, this court finds it significant that the IHO concluded, in her opinion, that the parents were contriving excuses not to participate in any reconvened meeting. The same IHO presided at the impartial hearings for both the 2017-18 and 2018-19 school years.  She had two opportunities to see and hear the parents testify. And she had found in favor of the parents for the first year, so she cannot be accused of harboring any bias or ill will toward them or their positions. Yet she concluded that the parents had not cooperated with M.G.'s educational planning, made unreasonable" demands on the CSE (R0094) and engaged in "obstructive efforts," (R0085). IHO Carter also "question[ed] the parents' credibility," in particular the father's statement that he had visited the placement school twice[9] to demonstrate cooperation – testimony that could not be verified by school visitation records. (R0094) The IHO had the tremendous advantage of actually seeing and hearing the parents and the other witnesses, as well as their lawyer; I can only say that, on the cold record before me, I would reach exactly the same conclusions.

In sum, this court can see no reason in law and no basis in the record to overturn any of the findings of the SRO with regard to the alleged procedural defalcations – or to conclude that the few minimal procedural errors made by the district in trying to schedule a reconvened CSE meeting before the end of the 2017-18 school year even came close to denying M.G. a FAPE or her parents their right to be involved in the planning of her education.

### III.    The SRO Did Not Err in Concluding that the District's IEP Provided the Child With a FAPE

And so we turn to the merits of the CSE's recommended program for M.G.

The parents raise what the courts sees as three principal substantive challenges to the IEP's recommendations on the merits.

---

[9] The father could not recall on what dates he went, or who from iHOPE went with him. (R0094)

*A. Disability Classification*

First, the challenge the CSE's determination that the child's disability is classified as "severe multiple disabilities" rather than "traumatic brain injury."

This issue, as both the IHO and the SRO held, is a red herring. Disability classification is used for one and only one purpose: to ascertain whether a child falls into one of the 13 categories that render her eligible for special education services. (R0078.) But as my colleague Judge Seibel held in *M.R. v. Orangetown Central Sch. Dist.*, 2011 U.S. Dist. LEXIS 145177, at *28 (S.D.N.Y. Dec. 16, 2011), "It is not the classification per se that drives IDEA decision making; rather, it is whether the placement and services provide the child with a FAPE." CSEs are not supposed to rely on the disability category of a student in order to determine her needs, goals, accommodations and special education services. 34 C.F.R. 300.304(c)(6); 8 NYCRR 200.4(b)(6)(ix). Instead, as the IHO put it, IDEA "provides that a student's special education programming, services, and placement must be based upon a student's unique special education needs and not upon the student's disability classification. 20 U.S.C. § 1412 (a)(3)." (R0078)

This particular child plainly suffers from multiple disabilities ("concomitant impairments, the combination of which cause such severe educational needs that they cannot be accommodated in a special education program solely for one of the impairments.") (R0040.) Whether one or more of those disabilities was cause by "an external physical force or by certain medical conditions such as stroke, encephalitis, aneurysm, anoxia or brain tumors" – the definition of a "traumatic brain injury"[10] – is (i) unproven on the record before this court (which contains no medical testimony at all), and (ii) beside the point. No one disputes that this child qualifies for special education services under IDEA. Therefore, for our purposes, the precise disability category in which she is classified

---

[10] Injuries that occur during birth are not considered "traumatic brain injuries." NYCRR 200.1(zz)(12).

is irrelevant. As the SRO held, "The significance of the disability category level is more relevant to the LEA and State reporting requirements than it is to determine an appropriate IEP for the individual student." (R0040.) For the latter exercise, it is necessary to determine the student's educational and management needs at a granular level, not with reference to her disability classification. Or, as the SRO also put it, "Once a student has been found eligible for special education, the present levels of performance sections of the IEP for each student is where the focus should be placed, not the label that is used when a student meets the criteria for one or more disability categories." (R0041).

*B. Classroom Placement*

The reason for the parents' insistence that their daughter be classified as having a traumatic brain injury becomes apparent when we consider their principal challenge to the CSE's proposed IEP. Having classified the child as having "severe multiple disabilities" and needing an educational program consisting primarily of habilitation and treatment, the IEP recommends that she be placed in a classroom capped at a maximum of 12 students, 1 teacher and four other adults (12:1+(3+1), or 12:1+4). This accords with 8 NYCRR 200.6(h)(4)(iii).

However, a different regulation, 8 NYCRR 200.6(h)(4)(ii)(a), provides that the class size for a child whose disability leaves her with "highly intensive" management needs that require a "high degree of individualized attention and intervention" is limited to 6 students, 1 teacher and 1 other supplementary school staffer (6:1+1). There is absolutely no question that M.G. has highly intensive management needs that require a high degree of individualized attention and intervention. District witnesses use that phrase when describing the child.

So what is one to do when a child qualifies is subject to the requirements of two conflicting regulations?

It does not seem that the State of New York has dictated an answer to that question.[11] But IDEA and New York State regulations require a CSE's evaluation of a student to "be sufficiently comprehensive to identify all of the student's special education and related services needs, whether or not commonly linked to the disability category in which the student has been classified. 34 CFR 300.302(c)(6); 8 NYCRR 200.4(b)(6)(ix). (R0040.) Therefore, the SRO resolved the discrepancy between two differing regulations that are equally applicable to this particular child by looking to her unique characteristics and needs. He engaged in an extensive and detailed evaluation (eight single spaced pages) of M.G.'s "complex educational needs…including [her] cognitive, academic, attention, communication, vision, speech, gross motor, mobility, fine motor, hydroencephalus, cortical visual impairment and cerebral palsy." He concluded that the girl's admittedly "highly intensive" management needs also qualified as "concomitant impairments the combination of which cause such severe educational needs that they cannot be accommodated in a special education program solely for one of the impairments." (R0041) In fact, he specifically found that her "highly intensive" management needs arose *because of her severe multiple disabilities*. (R0049.) He thus held that the CSE correctly placed her in a classroom that conformed to the regulation found in 8 NYCRR 200.6(h)(4)(iii), rather than one that conformed to 8 NYCRR 200.6(h)(4)(ii)(a).

In deciding which of the two different placements would work better for the child, the SRO found that M.G.'s needs would be better addressed in a classroom having a larger number of school staff members who were trained to work collaboratively with the teacher – a 12:1+4 classroom[12] –

---

[11] New York State apparently does not recognize the fact that a child can have fall into more than one disability classification, subject to conflicting regulations, since it only permits a district to identify a single classification on its forms. (R0078) This is, obviously, a ridiculous rule – one that fails on its face to recognize the unique characteristics of M.G., who is multiply disabled, which leads to the conundrum that faced the SRO in this case.

[12] It must be remembered that M.G. was also going to have a 1:1 aide with her at all times in whatever classroom she was placed, so in fact there would be 6 adults – one of whom was focused at all times on M.G. – in her 12:1+4 classroom.

rather than in a classroom with fewer students but also fewer staff. The SRO noted that the adult-to-student ratio in a 6:1+1 classroom was exactly the same as the ratio in a 12:1+4 classroom – 1 teacher and 1 adult for every three students – but found that the "greater variety in the type of school personnel typically found working with a student in the 12:1+4 special class setting" would be of benefit to the child, and were not "found in the definition of a 6:1+1 special class."

The SRO supported his decision with extensive references to the record, including testimony from the district psychologist, who indicated that the 12:1+4 class "was staffed with four paraprofessionals that are trained to work…collaboratively not only with the teacher, but with the related service providers" to both generalize the skills being taught and to provide repetition of those skills," which the student required (R0048) He also cited the testimony of a unit teacher from the recommended specialized school, who testified that M.G. was similar in needs to the students in her classroom and would obtain educational benefit if enrolled in that program. (*Id.*)

There is certainly record evidence that supports the SRO's finding that the CSE placement would have provided M.G. with a FAPE. As the SRO observed, M.G. has severe multiple disabilities: she suffers from cerebral palsy, global developmental delays and visual impairment. She cannot walk or speak or perform any of the tasks of daily living for herself. If that does not qualify as "severe multiple disabilities," I cannot imagine what does. The child's educational potential is limited, and her educational program consists largely of habilitation and treatment, with only modest academic goals.[13] The SRO, like the IHO before him, concluded that the child

---

[13] In this regard, it bears noting that the student's IEP identified her annual educational goals as improving jaw stabilization for eating and drinking, increasing oral motor awareness for secretion management and expansion of speech sound production, development of a functional communication system (the child cannot talk), performing wheelchair transfers with assistance, and improving such self-care skills as tooth brushing, dressing and feeding (R0049, citing IEP at R1203 et seq.) – in short, many different habilitation skills. Her proposed academic goals included being able to identify 35 kindergarten level high-frequency words at an 80% accuracy rate (R1202), copy text and solve addition problems using +1 and +2 if assisted with multisensory cues (R1203). This is not the normal academic curriculum for a 10 year old child.

suffered from so many different disabilities that her needs were best served by being in the 12:1+4 classroom. And he specifically found that the presence of additional adults in the classroom was most likely to provide "precisely the type of programming that will address this student's unique needs." (R0049.)

This is precisely the sort of decision that a person like the SRO, who has extensive experience in the education of profoundly disabled children, is equipped to make – and that this court is ill-equipped to second guess. There is no evidence in the record suggesting that the presence of fewer children would be of greater benefit to M.G. than the presence of more adults – especially as M.G was also to have the full-time services of a 1:1 aide, in addition to the teacher and the other 4 adults, at all time. From the record, it appears that the SRO, confronted with a situation in which, at least arguably[14] two conflicting regulations applied and there was no rule that dictated the choice between them, did precisely what we would want him to do: considered the child's unique needs and reached an informed and expert conclusion that one setting offered her greater potential benefit than the other. This court has no basis to overturn his decision.

It would be different if the only question before the court were whether M.G.'s placement ran afoul of the one and only possible governing state regulation. While a court is expected to give deference to an SRO in matters relating to educational issues, an SRO is not entitled to deference where questions of law are concerned. Rowley, 458 U.S. at 206; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 239 (2d Cir. 2012); Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P., 373 F.Supp.2d 401, 408 (S.D.N.Y. 2005); Arlington Cent. Sch. Dist. v. L.P., 421 F.Supp.2d 692, 696

---

[14] The parties disagree and have long disagreed about whether M.G. suffered any sort of traumatic brain injury (TBI) in the months following her birth. Significantly, both the IHO and the SRO concluded that it did not matter, since the child obviously suffered from severe multiple disabilities. But having concluded in 2017-18 that the record supported a finding of TBI, the same IHO concluded a year later, on a different record, that "a rationale [sic] reader could infer birth trauma is the etiology of Student's overall disabilities," (R0080), which would mean that she ought not be classified as TBI. Were it possible, I suspect the IHO – and I know the SRO – would have classified her as both.

(S.D.N.Y. 2006). Whether or not a recommendation complies with a state regulation would appear to present a question that a court is perfectly equipped to answer.

But the issue confronting the court is not whether M.G.'s placement conflicts with the one and only pertinent governing regulation. It is whether the SRO erred in concluding that, (1) where two different regulations governing class size apply to the child's situation and (2) where there is no settled rule of decision that gives one of those regulations precedence, the overall record supports the application of one regulation over the other. In this case, the overall record does indeed support the application of one regulation over the other. The SRO did exactly the right thing: considered the child's unique situation and reached a conclusion based on the evidence.  As there is ample evidence to support his conclusions, this court is in no position to say that the SRO – the person with expertise in educating disabled children – was wrong in so holding.

C. *Related Services*

Finally, the parents argue that the SRO erred in finding that the CSE's related services recommendation was appropriate. Again, I disagree.

The CSE recommended that all of M.G.'s related services (OT, PT, SLT (both individual and group) and vision education) be conducted in 30-minute increments.[15] iHOPE's IEP for the child, adopted by iBRAIN, called for 60-minute related service sessions. The SRO affirmed the IHO's determination that 30-minute sessions were appropriate. The evidence demonstrated that M.G. "quickly" became tired during her sessions, and when she was fatigued, she became frustrated and ceased to cooperate. The school psychologist testified that the amount of mental energy that a child like M.G. required to perform tasks that abled people "take for granted" was "overwhelming," and stated that, in her experience working with children like M.G., "when they're

---

[15] The 60-minute monthly parent counseling and training session is not challenged on this appeal.

fatigues, that's it." (R0050) This accorded with information found in the iBRAIN IEP for 2018-19, which described the student during PT sessions as "demonstrating behavior issues" and "getting frustrated very quickly . . . does not like to be touched too long." (*Id.*, Parent Ex. E at 21). The school psychologist also testified that 30-minute sessions of OT in particular were sufficient for M.G. given her level of attention and the benefit she would derive "without this being an uncomfortable experience for her." (R0050, citing Tr. at 356-57.)

Significantly, the iBRAIN witness testified that her related services were 60 minutes in length, not in order to give her additional therapy, but because of the time it took to transition the child safely from her wheelchair. (*Id*, citing Tr. at 534.) In other words, the 60 minutes was not intended to be 60 minutes of therapy, but an unspecified amount of therapy coupled with an unspecified amount of time for transitioning. But as the school psychologist observed, therapy time is supposed to begin "the moment therapy actually begins, and not while the child was transitioning." (*Id.*, citing Tr. at 421.) That being so, the additional time suggested by the parents does not appear to be necessary in order to allow the student to receive sufficient therapeutic attention. Indeed, iBRAIN's own evidence is to the effect that it was not going to give M.G. a full 60 minutes of therapy; and there appears to be no way of knowing exactly how much therapy she would receive in a given session. No evidence in the record suggests that the district planned to cut short M.G.'s 30 minutes of therapy in order to accomplish mechanical tasks like getting her into and out of her wheelchair; for the CSE, 30 minutes of therapy seems to have been precisely that – 30 minutes of actual therapy. And while the IHO found that the student had made progress with 60-minute sessions, she noted that there was no independent medical evidence in the record that either documented the child's need for such a long period or indicated that the child would regress with 30 minutes of therapy (R0083) – a finding that takes on greater significance in light

of the testimony that the 60-minute sessions included an undocumented amount of time for transitioning.

While the SRO did not dwell on this, it also appears, from the findings of the IHO, that iBRAIN offers everyone one of its students related services in 60-minute increments, without individualization (R0088) -- a uniformity that undercuts any argument that 60 minutes of actual therapy was best for this particular child -- who tired easily, became frustrated and required extra motivation during 60-minute sessions.  (R0082)

In light of this evidence, the SRO's conclusion that M.G. did not require 60-minute therapy sessions in order to receive a FAPE appears both sound and amply supported.

### IV.   The SRO Did Not Err in Refusing to Review the IHO's Unnecessary Findings With Respect to the Second and Third Prongs of the Burlington-Carter Test

The SRO did not err in failing to address the IHO's alternative conclusions that the parents had failed to show either that iBRAIN was an appropriate placement for their daughter or that equitable considerations favored providing them with reimbursement for their unilateral placement of M.G. in that school. Because the SRO concluded that the district's CSE had created an IEP that would have provided M.G. with a FAPE, there was no need to address the other two prongs of the so-called *Burlington-Carter* test. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359. 369-70 (1985); R.E. v. New York City Dep't of Educ., 694 F.3d 167. 184-85 (2d Cir. 2012); GB v. New York City Dep't of Educ., 145 F.Supp.3d 230, 244 (S.D.N.Y. 2015). The fact that the IHO elected to do so – I assume to avoid the delay and expense that would have been occasioned by a remand in the event that her FAPE findings were overturned – did not require the SRO to address them, and he was well within his rights to rest on his conclusion that the IEP provided the student with a FAPE.

## V.     The SRO Did Not Err In Overturning the IHO's Award of Transportation and Related Services Costs to the Parents

Notwithstanding her finding that the district had provide the child with a FAPE in the public school setting, the IHO awarded the parents the cost of transportation to iBRAIN during the 2018-19 school year. She also awarded certain costs relating to the provision of special services. From these unusual awards, the defendant District took an appeal.

The IHO did not find any defect in the district's proposal for transporting the student -- a 1:1 transportation paraprofessional; a lift bus; limited travel time; and two seats, one of them for a wheelchair – that denied the child a FAPE. Furthermore, the IHO found that the parents had failed to cooperate with the CSE, which prevented the district's Office of Pupil Transportation from arranging transportation for the child, as had been the case during her years at iHOPE. (R0093.) Instead the parents signed a transportation agreement with Sisters Travel and Transportation, LLC (Ex. K), which did not send a representative to the hearing, either to testify about that company's compliance with state and local safety regulations for school bus drivers, 8 NYCRR-NY 156.3,[16] or to justify the reasonableness of the rate of $315 per day that is charged for transporting M.G. to iBRAIN.

Nonetheless, the IHO – noting that the child was entitled to transportation services no matter where she went to school – directed that the district cover the cost of her transportation as provided by Sisters, "upon submission of compliance with prevailing city and state regulations regarding pupil transportation." (R0094)

IHO Carter also ordered the district to reimburse the parents for the cost of related services provided by iBRAIN, albeit at the district's "prevailing rate for the frequency and duration of

---

[16] In the contract Sisters represented that it complied with NYC Taxi and Limousine regulations, which have nothing whatever to do with the transportation of students to and from school; the latter are regulated exclusively by the New York State Department of Transportation.

services as recommended in the March 2018 IEP"[17] (Id.) – again, despite having found no inadequacy in the district's IEP.

The district appealed (see n.4, *supra*.), arguing that there was no basis in law for the IHO to have made such an award. The SRO vacated so much of IHO Carter's decision as awarded the cost of M.G.'s transportation to iBRAIN and the special services provided to M.G. by iBRAIN during the 2018-19 school year. (R0051). He noted that the parents had alleged no defect with respect to the special transportation services that were described in the CSE's IEP and found no error in the IHO's determination that there was no violation of the child's right to a FAPE by virtue of the CSE's plans for transportation services. As discussed extensively above, he also concluded that the district's proposal for the provision of related services to M.G. provided her with a FAPE. In the absence of a finding that the services offered by the district were inadequate or inappropriate, "The district is not required to reimburse the parents for the expenditures for private educational services." He therefore vacated so much of the IHO's order as required the district to fund the student's transportation and related services costs at iBRAIN.

The parents did not address this aspect of the SRO's decision in their moving or reply briefs. Any challenge to the SRO's findings in this regard is, therefore, waived.

## CONCLUSION

For these reasons, the plaintiff parents' motion for summary judgment is DENIED; the defendants' cross-motion for summary judgment is GRANTED; and the complaint is dismissed, with costs to the defendants.

The Clerk of Court is directed to enter judgment dismissing the complaint and to close the file.

---

[17] That would be 30-minute sessions, not the 60 minute sessions proposed by iBRAIN.

This constitutes the decision and order of the court; it qualifies as a "written decision."

Dated: September 10, 2021

_____
U.S.D.J.


BY ECF TO ALL COUNSEL